## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | **Case No. 19-po-631** |
| **v.** | * | |
| | * | |
| | * | |
| **NATHANIEL K. JUBOR,** | * | |
| | * | |
| | * | |
| **Defendant** | * | |
| | *********** | |

## <u>MEMORANDUM OPINION</u>

In this DUI case, the defendant moves to suppress the results of a chemical test of a sample of his blood drawn without his consent and without a judicial warrant. The government asserts that exigent circumstances justified the drawing of the defendant's blood without a warrant. Alternatively, the government argues that the good-faith exception to the exclusionary rule saves the blood test results from suppression. Before the Court are the defendant's Motion to Suppress Evidence (ECF No. 22), the government's Opposition thereto (ECF No. 24), the defendant's Post-Hearing Memorandum in Support of Defendant's Motion to Suppress (ECF No. 30), and the government's supplemental memorandum (ECF No. 31). The Court held a hearing on the motion on June 10, 2019. For the reasons stated below, the Court finds that the government's arguments are unavailing and suppresses the evidence flowing from the warrantless blood draw.

# BACKGROUND

## A. BLOOD DRAW POLICY

In early 2018, the Court adopted a procedure to govern the issuance of blood draw warrants requested by the United States Park Police ("USPP"). That procedure, which was memorialized in an email from the undersigned to the USPP liaison officer and became effective on January 19, 2018, stated:

> The United States Park Police may seek to obtain a warrant for a blood draw only in cases where there is a fatality, serious injury or other extraordinary circumstances. Before the duty magistrate judge is called, the Park Police must first obtain the approval of an Assistant United States Attorney.

Gov't Ex. 1.

> [I]n order to provide the USAO and the USPP with some guidance in regard to the implementation of the revised blood draw policy, the magistrate judges have discussed circumstances which would be considered "extraordinary" under the revised policy.
>
> In addition to cases involving a fatality or serious bodily injury, the magistrate judges agree that "extraordinary" circumstances would include cases involving: (1) a suspect under the influence of drugs (as opposed to alcohol); (2) a suspect that is so far under the influence of alcohol and/or drugs that he/she is incoherent and unable to effectively communicate with the police officer or participate in field sobriety tests[;] and (3) a suspect whose record shows a prior DUI conviction. *Clearly, this is not an exhaustive list of "extraordinary" circumstances and there will be other situations which warrant a request for a blood draw. It would . . . not be appropriate or possible to formulate a complete list of "extraordinary" circumstances as each case must be governed by its own particular facts, with the independent determination of the AUSA that the facts and circumstances of the particular case constitute "extraordinary" circumstances under the new policy.*

*Id.* (first alteration in original) (emphasis added) (the "Blood Draw Policy"). The Blood Draw Policy was adopted as a result of the Supreme Court's 2013 decision in *Missouri v. McNeely*, 569 U.S. 141 (2013).

Before *McNeely* was decided, it was the law in the Fourth Circuit that the natural metabolization of alcohol in the bloodstream created a *per se* exigency in DUI cases, justifying nonconsensual, warrantless blood draws.[1]  "[I]n this district, the court, prosecutors, and police were all operating under the belief that a warrant was not necessary to obtain a nonconsensual blood draw where there was probable cause for DWI."  *United States v. Lechliter*, 3 F. Supp. 3d 400, 406 n.3 (D. Md. 2014); *see United States v. Brooks*, Criminal No. PWG-14-0053, 2014 WL 2042028, at *4 (D. Md. May 16, 2014).  As such, before *McNeely*, the Court was never requested to issue a blood draw warrant.  In *McNeely*, the Supreme Court held that the natural metabolization of alcohol in the bloodstream does not present a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases.  *McNeely*, 569 U.S. at 145.  Rather, "that exigency in this context must be determined case by case based on the totality of the circumstances."  *Id.*  In the absence of consent, therefore, a warrant must be obtained to draw a DUI suspect's blood, unless exigencies in addition to the natural metabolization of alcohol in the bloodstream are present.

The impact of the *McNeely* decision on the Court was profound in light of the extraordinary number of DUI prosecutions in this district.  In 2018 the District of Maryland ranked first in the country in the number of DUI-related violation notices issued, accounting for more than 22% of all DUI-related violation notices issued nationally.  E-mail from Monte K. Tingle, Supervisory CVB Clerk, Central Violations Bureau, to the undersigned (Aug. 2, 2019, 12:09 EDT) (on file with the undersigned).  Most of the DUI cases prosecuted in this district involve incidents occurring on three heavily travelled highways: the Baltimore-Washington Parkway, the Suitland Parkway, and the Clara Barton Parkway.  These highways are maintained

---

[1] *See United States v. Reid*, 929 F.2d 990 (4th Cir. 1991).

by the National Park Service and are located within the special maritime and territorial jurisdiction of the United States. *See* 18 U.S.C. § 7(3); *United States v. Smith*, 701 F.3d 1002, 1004 (4th Cir. 2012); *United States v. Rubio*, 87 F.3d 1309, No. 95-5421, 1996 WL 329630, at *1 n.1 (4th Cir. June 17, 1996) (per curiam) (unpublished table decision). They are policed by the USPP.

In anticipation of the significant number of requests for blood draw warrants to come as a result of the *McNeely* holding, the Court acted promptly to formulate a procedure to govern the issuance of blood draw warrants. On the same day that *McNeely* was decided, the Chief United States Magistrate Judge consulted with the United States Attorney's Office (the "USAO") and the USPP. It was decided that each week one of three magistrate judges would be assigned to blood draw duty. The home and cell phone numbers of these duty magistrate judges were provided to the USPP. These duly assigned magistrate judges would be available to field blood draw warrant requests 24 hours per day, 365 days of the year. In the event the USPP made a DUI arrest and desired a warrant for a blood draw, the arresting officer or a supervising officer would directly call the magistrate judge on duty. The prior review and approval by an Assistant United States Attorney ("AUSA") was not required. After hearing the statement of probable cause from the officer, the magistrate judge would telephonically grant or deny the warrant. The conversation between the officer and the magistrate judge would be recorded on the magistrate judge's iPad.

The first request for a blood draw warrant occurred at 1:56 a.m. on April 18, 2013, less than 24 hours after the *McNeely* opinion was issued. Over the next several years, the number of requests for blood draw warrants increased from zero (pre-*McNeely*) to several hundred (post-*McNeely*), with the great majority of requests made in the middle of the night. The volume and

timing of these pending requests placed a significant stress on court resources. To address this issue, in late 2017, the Court undertook an evaluation of the procedure then in place. After much discussion and consideration, the Court adopted the Blood Draw Policy.

The Blood Draw Policy strikes a reasonable balance between the efficient utilization of court resources and the ability of the USPP to obtain evidence of blood alcohol content in DUI cases. It modified the prior policy adopted in the wake of *McNeely* in several important respects. First, it required the review and approval by an AUSA before a request for a blood draw warrant was made to a magistrate judge. This requirement is consistent with the long-standing policy in this district that, before a request for any search warrant is made to a magistrate judge, it is first reviewed and approved by an AUSA. This requirement provides assurance to the Court that an AUSA independently reviewed the legal and factual sufficiency of the warrant application before the USPP presented the request to the Court.

The Blood Draw Policy also modified the prior procedure by providing a non-exclusive list of circumstances in which the Court would consider issuing a blood draw warrant. In adopting the Blood Draw Policy, the Court envisioned that there would be occasions where the AUSA would not approve a request for a blood draw warrant and, therefore, blood would not be tested. The Court was cognizant, however, of the Supreme Court's 2016 holding in the case of *Birchfield v. North Dakota*, 579 U.S. ___, 136 S. Ct. 2160 (2016). In *Birchfield*, the Supreme Court affirmed the criminal prosecution of a DUI suspect for refusing to consent to a breath test. 136 S. Ct. at 2186-87. In the context of prosecutions involving the USPP, 36 C.F.R. § 4.23(c)(2) provides that "[r]efusal by an operator to submit to a [breath test] is prohibited and proof of refusal may be admissible in any related judicial proceeding." Therefore, in cases where the AUSA does not approve a blood draw warrant, the government may still prosecute the suspect

for refusing to consent to the breath test.  The penalty for refusing a breath test is the same as for DUI – six months' incarceration and a $5,000 fine.  Further, the sentence for refusing a breath test can run consecutively to the sentence for the DUI offense. Also, in adopting the Blood Draw Policy, the Court recognized that the government may still prosecute a DUI suspect under the general DUI statute (36 C.F.R. § 4.23(a)(1)) without the results of a blood test.  Finally, even in a case where a DUI suspect is only convicted of test refusal, in fashioning a sentence the Court would be able to consider evidence relating to uncharged or even acquitted conduct related to the defendant's driving under the influence of alcohol.  *United States v. Saxby*, No. 1:11-CR-132, 2012 WL 1230730, at *2 (M.D.N.C. Apr. 12, 2012); *see United States v. Grubbs*, 585 F. 3d 793, 798-803 (4th Cir. 2009); *United States v. Jones*, 31 F.3d 1304, 1316 (4th Cir. 1994); U.S.S.G. § 1B1.3.  Defendants are convicted in federal courts across the country of DUI-related offenses in cases where the government does not have evidence of blood alcohol content or where such evidence is excluded.  *See United States v. Stanton*, 501 F.3d 1093, 1100 (9th Cir. 2007) (affirming defendant's conviction under 36 C.F.R. § 4.23(a)(1) on the basis of the totality of circumstantial evidence at trial despite magistrate judge's refusal to admit breath test results because of government's failure to lay proper foundation); *United States v. Nguyen*, No. CR F 06-0075 AWI, 2008 WL 540230 (E.D. Cal. Feb. 25, 2008) (district court affirming defendant's conviction under 36 C.F.R. § 4.23(a)(1), even though magistrate judge had acquitted defendant under § 4.23(a)(2)).

**B.    FACTS**

After considering the evidence produced at the hearing on the motion to suppress, the Court finds the following facts.  The government's primary witness at the hearing on the motion to suppress was USPP Sergeant Adam Zielinski.  Sergeant Zielinski testified that he had been a

police officer for more than sixteen years. He had been a supervisor in the USPP's Traffic Safety Unit since 2011. The Traffic Safety Unit is a unit within the USPP that specializes in drug and alcohol training programs. Sergeant Zielinski is also qualified as a drug recognition expert, a fatal-crash reconstructionist, and a certified breathalyzer technician. He had made approximately 2,500 DUI arrests and administered field sobriety tests approximately 3,500 times in his career.

On Saturday, February 9, 2019, at about 4:00 a.m. Sergeant Zielinski received a call to assist another officer who had stopped a vehicle and suspected the driver to be under the influence of alcohol. He was advised that the vehicle was stopped because it failed to slow down or move over for the officer whose police cruiser was on the shoulder of the road with its emergency lights on.[2] Sergeant Zielinski proceeded to the location of the stop, which was on the northbound side of the Baltimore-Washington Parkway, south of I-495. Upon his arrival, Sergeant Zielinski was directed to the vehicle that the other officer had stopped. The defendant was seated in the driver's seat and was the sole occupant. The defendant advised Sergeant Zielinski that he was coming from a club in Bladensburg, Maryland, although he did not admit that he had anything to drink there. While speaking with the defendant, Sergeant Zielinski smelled an odor of alcohol coming from the vehicle. Suspecting the driver to be under the influence of alcohol, Sergeant Zielinski directed the defendant to step out of his vehicle for field sobriety testing. Because of the extremely cold temperature, Sergeant Zielinski only administered the horizontal-gaze nystagmus ("HGN") test and the vertical-gaze nystagmus

---

[2] *See* Md. Code Ann., Transp. § 21-405(e)(2) (applicable in this case through 36 C.F.R. § 4.2).

("VGN") test.[3]  Sergeant Zielinski testified that the defendant exhibited six clues on the HGN

test, which signified to him that the defendant was under the influence of alcohol.[4]  He also

testified that the defendant exhibited signs of VGN, which signified a high dosage of alcohol for

the defendant.  The defendant agreed to submit to a roadside breath test,[5] which was positive for

alcohol.  At that point, Sergeant Zielinski placed the defendant under arrest for DUI and

transported him to the police station.

At the police station, the desk officer read to the defendant a form entitled "36 CFR

Chemical Testing Notice."  Gov't Ex. 2.  This form is used by the USPP to advise DUI

arrestees of their rights regarding chemical testing to determine the blood alcohol or drug

---

[3] The HGN test "measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other." *Pennsylvania v. Muniz*, 496 U.S. 582, 585 n.1 (1990).  "An HGN test involves having a person follow a stimulus, such as a pen, with his or her eyes to observe if the subject's eyes involuntarily jerk.  Involuntary eye movements suggest that the subject is intoxicated." *United States v. Wilson*, 711 F. App'x 706, 707 (4th Cir. 2017) (per curiam).  "The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated 'the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct.'" *Muniz*, 496 U.S. at 585 n.1.  By contrast, "[a]n officer checks for vertical gaze nystagmus by raising an object several inches above the subject's eyes.  As with the horizontal gaze nystagmus test, an officer is looking for the jerking of the eyes." *Babers v. City of Tallassee*, 152 F. Supp. 2d 1298, 1302 (M.D. Ala. 2001) (citation omitted).  "The vertical gaze nystagmus test is not part of the horizontal gaze nystagmus test, but is a good indicator of a person's impairment due to alcohol or certain other drugs." *Id.*

[4] Sergeant Zielinski testified that, in addition to alcohol, nystagmus may indicate that a person is under the influence of certain drugs.  Mot. Suppress Hr'g Tr. 23, 44, ECF No. 29.  Indeed, there are many other causes of nystagmus that are unrelated to alcohol consumption, including the ingestion of certain drugs.  *See United States v. Horn*, 185 F. Supp. 2d 530, 556 n.45 (D. Md. 2002).

[5] A roadside breath test provides a preliminary assessment of a driver's blood alcohol concentration.  *Birchfield*, 136 S. Ct. at 2170.  A preliminary roadside breath test is inadmissible.  *See United States v. Iron Cloud*, 171 F.3d 587, 590-91 (8th Cir. 1999).  The preliminary roadside breath test may be one factor in establishing probable cause, however.  *See Stanton*, 501 F.3d at 1101.

content.  The defendant was advised of these rights at 4:30 a.m.  After being advised of his rights, the defendant consented to a breath test.  Upon receiving the defendant's consent, Sergeant Zielinski prepared for the administration of a breath test.  First, the defendant was observed for a period of twenty minutes to ensure that "residual mouth alcohol," which can inflate results and expose the test to an evidentiary challenge at trial, had dissipated and that the defendant had not inserted any food or drink into his mouth.  *See Birchfield*, 136 S. Ct. at 2192 (Sotomayor, J., concurring in part and dissenting in part).  At the conclusion of that observation period, the defendant attempted to provide his first breath sample at 5:12 a.m.  The defendant did not blow into the machine as instructed.  A second sample was attempted with the same results. Thereafter, several more attempts were made with the same results.  In all, there were twelve failed attempts.  The defendant either would not or could not provide a sufficient breath sample. The last attempt was at 5:41 a.m.  At that point, Sergeant Zielinski advised the defendant that he refused to give a chemical test, charged him with test refusal, and transported him to the hospital for a blood draw, which was conducted at 5:58 a.m.  After the blood sample was taken, the defendant was transported back to the police station.  He was detained until an initial appearance before the undersigned on Monday, February 11, 2019.  In all, Sergeant Zielinski issued ten violation notices to the defendant charging him with a number of offenses, including driving under the influence of alcohol (36 C.F.R. § 4.23(a) (1)); driving under the influence of alcohol per se (36 C.F.R. § 4.23(a) (2)); and refusal to submit to chemical testing (36 C.F.R. § 4.23(c) (2)).

Sergeant Zielinski never asked the defendant to consent to a blood draw and never obtained the defendant's consent to the blood draw.  Mot. Suppress Hr'g Tr. 46, ECF No. 29. Also, Sergeant Zielinski did not follow the Blood Draw Policy by contacting the duty AUSA

before obtaining a sample of the defendant's blood.  *Id.* at 37, 49.  He testified that he was aware of the Blood Draw Policy.  In fact, as a supervisor, each week he received a copy of it from the court liaison officer along with the phone number for the duty AUSA for that week.  *Id.* at 7, 13-14, 63-64.  He testified that, since the Blood Draw Policy was implemented in January 2018, he had called the duty AUSA twenty-five to thirty times to seek approval for a blood draw warrant.  *Id.* at 50.  He was not able to reach the duty AUSA on only about five of those occasions.  *Id.* at 51.  On all the other occasions where he had contacted the duty AUSA, he always had been granted approval to contact the magistrate judge.  *Id.* at 52.  When asked why he did not attempt to call the duty AUSA (or a magistrate judge), Sergeant Zielinski testified that he felt there were exigent circumstances because "the individual was trying to postpone the breath sample, and I needed to get an evidentiary sample of his blood to determine the alcohol *and/or drug content*."  *Id.* at 38:3-5 (emphasis added).  When asked specifically why he did not call a magistrate judge to get a warrant, Sergeant Zielinski testified that, although he was aware of the ability to call a judge in the middle of the night, he did not attempt to do so because "[o]ne wasn't available.  I didn't have the time."  *Id.* at 38:18.

Sergeant Zielinski's decision to disregard the process to obtain a warrant in accordance with the Blood Draw Policy was based on guidance he received from the USAO.  This is clearly reflected in the following excerpt of Sergeant Zielinski's testimony:

THE COURT:  [A]nd what did you understand the changes to be in the policy?

THE WITNESS:  That based on the AUSA, that if we had somebody who was a first [-] time offender, that we can take him to the hospital and get a blood draw based on the exigent circumstances.

THE COURT:  Okay.  The exigent circumstances being what?

10

THE WITNESS:  That there's evidence inside the person's body and it's being removed or released based on breath, urine, saliva, everything like that[,] based on the metabolism rate.

THE COURT:  Okay.  And I am just trying to be clear here.  So your understanding is that the simple natural dissipation of alcohol causes an exigent circumstance?

THE WITNESS:  That and *based on the directive that the AUSA sent out*.  Yes.

THE COURT:  Okay.  And if that creates an exigent circumstance on its own, you believed your guidance was that you could take someone to the hospital for a blood draw?

THE WITNESS:  That is correct.

THE COURT:  Without first seeking a judicial warrant?

THE WITNESS:  That's correct.

*Id.* at 65:18-66:16 (emphasis added).

The "directive" to which Sergeant Zielinski referred is a three-paragraph statement entitled "AUSA Blood Samples with Exigent Circumstances Guidance" (the "Guidance Statement").  Def.'s Ex. 1.  According to the testimony at the suppression hearing, about one or two months after the implementation of the Blood Draw Policy, the USAO disseminated the Guidance Statement to the USPP.  The Guidance Statement stated:

> After checking with my supervisors, I make the following suggestion for DUI arrests in which the officers feel it necessary to take a blood sample, but the magistrate judges refuse to consider for seizure warrants.  This would apply to cases in which the driver is a first offender, no injury occurs as a result of the drunk driving, and the officer suspects the defendant is under the influence only of alcohol, not drugs.

> After the driver has been given an opportunity to take a breath-alcohol test, take the driver to the hospital for a blood sample without a warrant.  The exigent circumstances that we believe justify this course of action are 1) the fact that the officer has probable cause to believe there is alcohol in the driver's system, 2) that alcohol is disappearing, and 3) there is no mechanism to get an oral seizure warrant.

If this scenario occurs and makes it to court, I will litigate the issue under the exigent circumstances exception to the warrant requirement.[6]

*Id.*

## DISCUSSION

## A.  EXIGENT-CIRCUMSTANCES EXCEPTION TO THE FOURTH AMENDMENT

On these facts, the government asserts that exigent circumstances were present in this case that justified the drawing of the defendant's blood without a warrant under the exigent-circumstances exception to the Fourth Amendment.  In addition to the natural metabolization of alcohol in the defendant's bloodstream, the government argues that there was no procedure available for Sergeant Zielinski to request a warrant and that, therefore, it was proper for Sergeant Zielinski to transport the defendant to the hospital for a blood draw without a warrant. The government points out that this case did not involve any of the "extraordinary" circumstances referred to in the Blood Draw Policy – "No accident occurred.  No one was killed or injured.  The police suspected the defendant was under the influence of alcohol, not drugs. The defendant had no prior drunk driving convictions."  Gov't's Opp'n 7, ECF No. 24.  The government thereupon proclaims: "This Court has prohibited the police from seeking a warrant. . . . The police were told by the U.S. District Court *not* to contact a magistrate judge for a warrant for a blood draw under these circumstances.  That made it impossible for Sgt. Zielinski to request a warrant."  *Id.*  The Court rejects the government's argument for several reasons.

It is clear from the evidence that the only exigency present in this case was the natural metabolization of alcohol in the defendant's bloodstream.  Therefore, under *McNeely*, a warrant was required.  On direct examination, Sergeant Zielinski testified that he transported the defendant to the hospital for the blood draw because blood alcohol evidence was being lost

---

[6] The Court first became aware of the Guidance Statement at the suppression hearing on June 10, 2019, more than a year after it was disseminated to the USPP.

because of the time expended trying to obtain a sufficient breath sample from the defendant. Mot. Suppress Hr'g Tr. 71-73, ECF No. 29. As previously noted, Sergeant Zielinski did not attempt to call the duty AUSA and/or a magistrate judge to determine if one was, in fact, available, although he was aware of his ability to do so. *Id.* at 38. In response to a hypothetical question posed by the Court, however, Sergeant Zielinski testified that, if the defendant had refused to consent to the breath test at the outset (immediately after he was advised of his rights in regard thereto), he would not have transported the defendant to the hospital for the blood draw. *Id.* at 71-72. In response to follow-up questions on re-cross examination by defense counsel, Sergeant Zielinski confirmed that, if the defendant had refused to consent to the breath test at the outset, he would not have transported him to the hospital for the blood draw, but he would have charged the defendant with test refusal and released him from the station. *Id.* at 75-76.

Clearly, the determining factor in Sergeant Zielinski's decision to transport the defendant to the hospital for the blood draw was the loss of blood alcohol evidence resulting from the passage of time due to the failed breath test attempts. The defendant's blood alcohol was being metabolized throughout his encounter with Sergeant Zielinski. "[T]he percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *McNeely*, 569 U.S. at 151 (quoting *Schmerber v. California*, 384 U.S. 757, 770 (1966)). Blood alcohol evidence was being lost because of the metabolization process whether the defendant refused to consent to the breath test at the outset or whether he constructively refused to consent to the breath test by his repeated failure to give a proper breath

sample.[7]   Yet, Sergeant Zielinski testified that the first situation did not warrant a ride to the hospital for a blood draw, but the second did.   The holding in *McNeely* is clear and unequivocal: "[I]n drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant."   *McNeely*, 569 U.S. at 165.   This case falls squarely within *McNeely*'s holding.   If no exigency existed by the defendant's express refusal to consent to the breath test at the outset, then no exigency was created because of the defendant's constructive refusal by failing to give a proper breath sample later.

Further, the government's argument that the Court prohibited Sergeant Zielinski from seeking a warrant simply is without merit.   The Blood Draw Policy applies in all cases where the USPP desire to obtain a warrant for a blood draw, no matter how ordinary or complex.   A magistrate judge is available 24 hours a day, 365 days a year to consider a request for a warrant.   The USPP maintains the phone numbers for the magistrate judges on file.   Each week USPP supervisors receive a copy of the Blood Draw Policy with the name and phone number of the duty AUSA from the court liaison officer.   If a USPP officer desires a blood draw warrant, he must first contact the duty AUSA.   If the duty AUSA approves the request, the officer may then call the magistrate judge directly.   This procedure is simple and unambiguous.   Here, Sergeant Zielinski did not even attempt to contact the duty AUSA, although there was no emergency or other exigencies preventing him from doing so.   Sergeant Zielinski was aware of the procedure in place to obtain a warrant.   In fact, he had followed that procedure many times in the past.   He

---

[7] "A breath test may also be ineffective if an arrestee deliberately attempts to prevent an accurate reading by failing to blow into the tube for the requisite length of time or with the necessary force."   *Birchfield*, 136 S. Ct. at 2185.   "But courts have held that such conduct qualifies as a refusal to undergo testing, and it may be prosecuted as such.   And again, a warrant for a blood test may be sought."   *Id.* (citations omitted).

elected not to follow it in this case, however. As the Supreme Court recognized in *McNeely*, "[o]ther factors present in an ordinary traffic stop, such as the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search." *Id.* at 164. Here, a procedure was in place, and a magistrate judge was available. Simply stated, there was no exigency in this case due to lack of a warrant procedure or the availability of a magistrate judge. The police may not create an exigency and then rely on it to justify a warrantless search. *See Kentucky v. King*, 563 U.S. 452, 461-62 (2011); *United States v. Lundin,* 817 F.3d 1151, 1158 (9th Cir. 2016) ("[E]xigent circumstances cannot justify a warrantless search when the police 'create the exigency by engaging . . . in conduct that violates the Fourth Amendment.'" (alteration in original) (quoting *King*, 563 U.S. at 462)).

Had Sergeant Zielinski followed the procedure set out in the Blood Draw Policy, it is likely that the duty AUSA would have approved the warrant and authorized a call to the magistrate judge. The only evidence indicating that the defendant had consumed only alcohol (not drugs) was the odor of alcohol coming from the defendant's vehicle and the results of the roadside breath test. Sergeant Zielinski did not testify that he observed the other indicia of alcohol intoxication typically present in DUI cases. He did not testify that the defendant had bloodshot and watery eyes, slurred speech, or disheveled clothing. He did not testify that the defendant was unsteady on his feet. He did not testify that the defendant admitted to drinking anything or that he observed one or more open containers of alcoholic beverages in the defendant's vehicle. *Cf. McNeely*, 569 U.S. at 145 ("The officer noticed several signs that McNeely was intoxicated, including McNeely's bloodshot eyes, his slurred speech, and the smell of alcohol on his breath. McNeely acknowledged to the officer that he had consumed 'a couple

of beers' at a bar, and he appeared unsteady on his feet when he exited the truck." (citation omitted)). Sergeant Zielinski administered both the HGN and VGN tests on the defendant. He observed the presence of both HGN and VGN. He testified that HGN indicates that a person is under the influence of alcohol "and/or certain drugs." Mot. Suppress Hr'g Tr. 23:9, ECF No. 29. He testified that VGN could be caused by a high dose of alcohol present in the individual. On cross-examination, however, he acknowledged that VGN could also be present in an individual who has ingested one of three categories of drugs: (1) a high dose of a central nervous system depressant in his system, such as Xanax or Ambien; (2) a dissociative anesthetic, such as Phencyclidine; or (3) an inhalant, such as nitrous oxide, spray paints and thinners, or gasoline. *Id.* at 44. Although Sergeant Zielinski testified that he believed the defendant to be under the influence of alcohol, he also testified that he wanted to take the defendant to the hospital "to get an evidentiary sample of his [the defendant's] blood to determine the alcohol *and/or drug* content." *Id.* at 38:4-5 (emphasis added). Further, it is clear from Sergeant Zielinski's testimony that the failure of the defendant to give a proper breath sample after twelve attempts was not because of the defendant's inability to understand how to give a proper sample. He testified that the defendant communicated with him coherently and understood his instructions. Rather, he believed the defendant did not give a proper sample because he was trying to "postpone" the breath sample. *Id.* at 38:3. Here, had Sergeant Zielinski contacted the duty AUSA and recounted all of these facts — the results of the HGN and VGN tests, the absence of facts common in DUI suspects under the influence of alcohol (not drugs), his desire to obtain the blood draw to determine the alcohol "and/or drug" content of the defendant's blood, and the fact that the defendant was purposely failing to provide a proper breath sample in Sergeant Zielinski's opinion, the duty AUSA would have likely approved a request for a warrant and

16

authorized a call to the magistrate judge, and the magistrate judge would have likely authorized the warrant. That will never be known, however, because Sergeant Zielinski elected not to call the duty AUSA. There was no exigency in this case preventing Sergeant Zielinski from seeking a warrant. He was aware of the procedure in place to do so. He did it many times in the past. He had the phone number of the AUSA. He had time to do so – there was no accident to be investigated, no injuries to treat, etc. Nothing prevented him from seeking a warrant as required in this case by *McNeely*.

**B.      THE GOOD-FAITH EXCEPTION TO THE EXCLUSIONARY RULE**

Having found that the blood draw in this case was not justified under the exigent-circumstances exception to the Fourth Amendment, the Court now addresses the government's alternative argument that the good-faith exception to the exclusionary rule saves the evidence flowing from the blood draw from suppression. Specifically, the government argues that suppression is not appropriate in this case because the exclusionary rule is designed to deter police misconduct and because Sergeant Zielinski did not engage in any misconduct, but, rather, he followed the Court's instructions. Gov't's Opp'n 8, ECF No. 24. "By establishing its policy on oral warrants, the Court closed the door to obtaining warrants under the facts of this case, and cannot now condemn the police for not walking through that door." *Id.* The Court rejects this argument for the following reasons.

As the Supreme Court has explained, the exclusionary rule is "a prudential doctrine created by this Court to compel respect for the [Fourth Amendment] constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citation omitted). "Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment

violations." *Id.* at 236-37 (citations omitted). "Our cases have thus limited the rule's operation to situations in which this purpose is thought most efficaciously served. Where suppression fails to yield appreciable deterrence, exclusion is 'clearly. . . unwarranted.'" *Id.* at 237 (alteration in original) (citation omitted).

"[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 238 (alteration in original) (citation omitted). "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (citations omitted).

The good-faith exception to the exclusionary rule has been applied by the Supreme Court in several cases to save evidence from suppression. *Id.* at 249-50 (holding that, when police conduct search in objectively reasonable reliance on binding appellate precedent, exclusionary rule does not apply); *Herring v. United States*, 555 U.S. 135, 139-48 (2009) (holding that exclusionary rule does not apply when police mistakes leading to unlawful search are result of isolated negligence attenuated from search, rather than systemic error or reckless disregard of constitutional requirements); *Arizona v. Evans*, 514 U.S. 1, 10-16 (1995) (holding that exclusionary rule does not require suppression of evidence seized in violation of Fourth Amendment when erroneous information of outstanding arrest warrant resulted from court employees' clerical errors); *Illinois v. Krull*, 480 U.S. 340, 347-61 (1987) (holding that exclusionary rule does not apply to evidence obtained by police who acted in objectively reasonable reliance upon statute authorizing warrantless administrative searches, but which is

subsequently found to violate Fourth Amendment); *United States v. Leon*, 468 U.S. 897, 922-26 (1984) (holding that exclusionary rule does not apply when police seize evidence in reasonable, good-faith reliance on search warrant unsupported by probable cause).

The good-faith exception to the exclusionary rule does not apply in this case. The government's assertion that Sergeant Zielinski acted in good faith by following the Court's instructions in subjecting the defendant to the warrantless blood draw is not correct. In fact, Sergeant Zielinski did not follow the Court's instructions. Had Sergeant Zielinski actually followed the procedures set out in the Blood Draw Policy, he would have contacted the duty AUSA before taking the defendant to the hospital for the blood draw. He did not do so. Instead, Sergeant Zielinski testified that he based his actions on the Guidance Statement disseminated to the USPP by the USAO, not the Blood Draw Policy. The Guidance Statement misinterprets and misapplies the clear and unambiguous provisions of the Blood Draw Policy. Referring to the examples of "extraordinary" circumstances set forth in the Blood Draw Policy, the Guidance Statement provides that, in cases where the DUI suspect is a first offender, where no injury occurs as a result of the drunk driving, and the officer suspects the driver is under the influence of alcohol, not drugs, a blood sample may be obtained without a warrant. The Guidance Statement ignores the fact that the examples of "extraordinary" circumstances set forth in the Blood Draw Policy are not an exhaustive list, as expressly stated therein, but just examples. It also ignores the requirement of the Blood Draw Policy for the independent review and approval by the duty AUSA. The fact that a DUI suspect is a first offender or that the case does not involve an injury or that the driver is suspected of being under the influence of only alcohol should be considered in the totality-of-the-circumstances analysis required by *McNeely*, but, alone, these factors are clearly not exigent circumstances justifying a warrantless blood draw.

Nevertheless, the government's Guidance Statement instructs the USPP that, in those cases, a blood draw may be obtained without a warrant.

In the good-faith exception cases decided by the Supreme Court, the focus is on the conduct of the police officer and the basis for his actions. Did the officer act in accordance with binding legal precedent, later determined to be unconstitutional? Did the officer act in good-faith reliance on a warrant, later determined to violate the Fourth Amendment? Did the officer act in good-faith reliance on information, later determined to be erroneous? Here, Sergeant Zielinski acted in accordance with the government's Guidance Statement when he did not seek a blood draw warrant. He was aware that warrants are generally required for blood draws.[8] In this case, the defendant was never asked to consent to a blood draw, nor does the record support any "anticipated delays in obtaining a warrant" because there was never any attempt to obtain one. Sergeant Zielinski knew how to obtain a warrant because he had done so many times before. Yet, with that knowledge and experience, he elected to follow the Guidance Statement, rather than *McNeely*, and subject the defendant to the warrantless blood draw.

---

[8] The 36 CFR Chemical Testing Notice provides:

> In the event that the police seek to test your <u>blood</u> to determine the sample's alcohol and/or drug content, the officer is generally obligated to seek a search warrant unless anticipated delays in obtaining a warrant justify a blood test without judicial authorization OR unless you voluntarily agree to submit a blood sample.

Gov't's Ex. 2.

## **CONCLUSION**

For the foregoing reasons, the defendant's Motion to Suppress Evidence (ECF No. 22) is

**GRANTED**.  A separate order will issue.


Date: October 9, 2019                                              _____/s/_____

Thomas M. DiGirolamo
United States Magistrate Judge